# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SCOTT SHOEMAKER,<br><br>    Plaintiff,<br><br>  vs.<br><br>NORTHROP GRUMMAN CORPORATION, a Delaware corporation; NORTHROP GRUMMAN SPACE & MISSION SYSTEMS CORP., a Ohio corporation; NORTHROP GRUMMAN MISSION SYSTEMS, INC., a subsidiary of Northrop Grumman Corporation; MICHAEL B. DONLEY, United States Secretary of the Air Force; UNITED STATES DEPARTMENT OF THE AIR FORCE; DANIEL J. BOEH; and DWIGHT BAKER,<br><br>    Defendants. | Case No.: 2:08-cv-01793-RLH-RJJ<br><br>**O R D E R**<br><br>(Motion for Summary Judgment–#69) |

   Before the Court is Defendant Northrop Grumman Technical Services Inc. ("Northrop") and Dwight Baker's **Motion for Summary Judgment** (#69, filed May 9, 2011). The Court has also considered Plaintiff Scott Shoemaker's Opposition (#76, filed June 20), and Defendants' Reply (#77, filed July 12).

/

1

**BACKGROUND**

This dispute arises out of Shoemaker's having been fired by one government contractor working under one Air Force unit, subsequently being rehired by a separate government contractor working under a different Air Force unit, and then being fired for accessing his old computer system over the network while working for the second contractor. In essence, Shoemaker worked for Northrop which was a contractor to the 547th Intelligence Squadron ("547th IS") at Nellis Air Force Base ("Nellis").[1] Shoemaker was fired from Northrop in March of 2007 for accessing inappropriate websites from his government computer. Later in 2007, Shoemaker was hired by ManTech to work on ManTech's contract with the Joint Unmanned Aerial System Center of Excellence ("JUAS COE") at Creech Air Force Base ("Creech"). Soon after starting work with ManTech and JUAS COE and the day he regained access to the unclassified computer network utilized by personnel at Nellis and Creech Air Force Bases (the "NIPRNET"), Shoemaker accessed his old computer and a 547th IS shared drive attached to it from his new system at JUAS COE. (Dkt. #69 Ex. 14, Shoemaker Dep. 33:14-34:12.) Shoemaker continued accessing or attempting to access his old computer and the 547th IS's shared drive for the next two days. (*See id.* 40:5-42:13.) On the third day that Shoemaker accessed his old computer and files, Dwight Baker and Charles Vosvick disconnected the computer, reported the incident to Rick Helmick, the 414th Combat Training Squadron's ("414th CTS") Security and Telecommunications Manager. (*Id.* Ex. 19, Dwight Baker Dep. 76:9-13, 77:2-12; Ex. 5, Rick

---

[1] Defendants provide an excellent overview of the Air Force structure at Nellis and Creech Air Force Bases, contracting at the bases, the Nellis/Creech network (both the NIPRNET and SIPRNET) and how it is administered, network accounts, network access rights, and account deletion in their motion. (Dkt. #69, Mot. 3-10.) Shoemaker does not dispute or even discuss the vast majority of this overview. The only section that Shoemaker seemingly disputes is account deletion procedure. However, the source he cites (SMSgt. Warzynak's deposition) to dispute the procedure actually supports Defendants' overview. (*See* Dkt. 76, Opp. 4-6, particularly nn. 8, 9.) The Court will not go into the factual detail provided by Defendants except where necessary but rather directs the reader to Defendants' motion.

The Court further directs the reader to its Order (Dkt. 42, June 30, 2009) for a more thorough recitation of Shoemaker's original allegations.

AO 72
(Rev. 8/82)

Helmick Dep. 9:4-8; 30:6-17.) Baker, Helmick, and Vosvick then determined that Shoemaker's access needed to be reported further up the chain of command. (*Id.* Ex. 19, Baker Dep. 80:2-9.)

Baker first went to the 99th Communications Squadron's (99th CS) (the entity in charge of the network) Information Technology Specialist responsible for computer, communications, and network security involving both hardware and software, Rachel Whitfield. (*Id.* 80:10-16.) Whitfield then took Baker to report Shoemaker's access to the 99th CS's Chief of Network Operations Rick White and First Superintendent Master Sergeant (now Senior Master Sergeant) Daniel Warzynak. (*Id.* 80:12-81:1.) Baker then reported to White and SMSgt. Warzynak and showed them screen shots of Shoemaker's account accessing his old computer and the shared drive and being in the local administrators group for the 547th IS's computers. (*Id.* Ex. 15, Rick White Dep. 12:18-25, 19:12-18; Ex. Ex. 7 SMSgt. Daniel Warzynak Dep. 13:4-14:3.) SMSgt. Warzynak then reported this incident to the Nellis Judge Advocate General ("Nellis JAG") office, which told SMSgt. Warzynak to restrict Shoemaker's network (NIPRNET) access immediately, which Warzynak did. (*Id.* Ex. 7, Warzynak Dep. 29:21-30:8; *see also* Ex. 22, Memorandum for Record dated Dec. 5, 2007.) Warzynak then contacted the Information Assurance Network Security office at Langley Air Force Base (Headquarters Air Combat Command), which agreed that Shoemaker had improperly accessed the network. (*See id.* Ex. 7, Warzynak Dep. 22:1-14, 62:11-63:5; *see also* Dkt. #76, Opp. Ex. 8., Warzynak Dep. 26:12-22.)

After Shoemaker's network access was terminated, Shoemaker reported to his own superiors to find out why his network account was no longer working. (*Id.* Ex. 10, Donald Cunningham Dep. 17:4-7.) The 99th CS informed Shoemaker's superiors of his accessing the 547th Computer system and that there would be an investigation. (*Id.* 22:1-23:11.) Cunningham then informed ManTech of these developments. (*Id.* 24:1-21.) Because Shoemaker's account was locked, JUAS COE decided Shoemaker should not be in the building during the investigation and ManTech put him on administrative leave. (*Id.* 26:25-27:14.) JUAS COE's contracting officers, 1st Lt. Amy Ciaravolo and Maj. Daniel Boeh, investigated the incident and eventually determined

3

1  and informed Shoemaker's supervisors that Shoemaker would not be allowed to continue working
2  on the JUAS COE contract. (*Id.* Ex. 12, Maj. Daniel Boeh Dep. 11:18-12:1, 13:2-12, 19:24-20:23,
3  24:18-22, 25:10-26:12; Ex. 23, Letter from Maj. Boeh dated Dec. 13, 2007.)
4    Maj. Boeh also informed Navigator (the contractor through which ManTech
5  subcontracted on the JUAS COE contract) that the government would generate a JPAS (Joint
6  Personal Adjudication System) report and invited Navigator to do the same. (*See id.* Ex. 23, Maj.
7  Boeh Letter.) Regardless of Maj Boeh's letter, there is no evidence that the government or
8  Navigator generated a JPAS report regarding this incident (*id.* Ex. 12, Boeh Dep. 27:24-28:28:6;
9  Ex. 11, 1st Lt. Amy Ciaravolo Dep. 26:1-17; Ex. 7, SMSgt. Warzynak Dep. 39:17-40:6; Ex. 10,
10 Cunningham Dep. 32:17-25), only that ManTech did (*id.* Ex. 10, Cunningham Dep. 32:22-33:13,
11 33:22-34:5; Ex. 24, JPAS Incident Report, NGTS_000432-33). Also, neither Navigator nor
12 ManTech raised an objection to Maj. Boeh's decision that Shoemaker could no longer work on the
13 contract. (*Id.* Ex. 11, 1st Lt. Ciaravolo Dep. 59:17-60:10; Ex. 12, Maj. Boeh Dep 23:7-24; Ex. 10,
14 Cunningham Dep. 32:9-16.)
15   Shoemaker filed his complaint on December 19, 2008, against multiple
16 defendants. The Court dismissed the military defendants for various reasons. (Dkt. #42, Order,
17 June 30, 2009.) After Shoemaker amended his complaint, the parties stipulated to dismiss the
18 Northrop related entities other than Northrop itself and Defendant Baker. (Dkt. #52, Order, Jan.
19 12, 2010.) Shoemaker asserts the following claims against Northrop (under the theory of
20 *respondeat superior*) and Baker: (1) improper blacklisting, (2) defamation, (3) tortious interference
21 with contract, (4) tortious interference with prospective economic advantage, and (5) civil
22 conspiracy. Further, Shoemaker alleges that Northrop is liable under the theory of *respondeat*
23 *superior*. Now before the Court is Defendants' motion for summary judgment. For the reasons
24 discussed below, the Court grants Defendants' motion.
25 /
26 /

AO 72
(Rev. 8/82)

## DISCUSSION

**I.     Standard**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir.1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288–89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to

1  "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.
2  The nonmoving party "may not rely on denials in the pleadings but must produce specific
3  evidence, through affidavits or admissible discovery material, to show that the dispute exists,"
4  *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply
5  show that there is some metaphysical doubt as to the material facts." *Bank of America v. Orr*, 285
6  F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).  "The mere existence of a scintilla of
7  evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

8  **II.     Analysis**
9      **A.     Blacklisting**
10 This Court previously determined in its order dismissing the Air Force defendants,
11 (Dkt. #42, Order 10 n.2, June 20, 2009), that Nevada's blacklisting statute is a criminal statute
12 without a private right of action.  Thus, the Court grants summary judgment on this claim as
13 Nevada does not provide a blacklisting claim which Shoemaker may assert on his own.

14     **B.     Defamation**
15 Drawing all inferences in the light most favorable to Shoemaker, Defendants have
16 shown they are entitled to judgment as a matter of law on Shoemaker's defamation claim.  To
17 prove defamation, a plaintiff must show "(1) a false and defamatory statement by defendant
18 concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at
19 least negligence; and (4) actual or presumed damages." *Chowdry v. NLVH, Inc.*, 851 P.2d 459,
20 462 (Nev. 1993).  Truth, however, is a complete defense to defamation.  *See Pegasus v. Reno*
21 *Newspapers, Inc.*, 57 P.3d 82, 88 (Nev. 2002).  Here, Shoemaker asserts that Baker defamed him
22 with various statements.  The Court gives the four statements Shoemaker addresses in his
23 opposition: first, Shoemaker claims that Baker's claim that Baker had deleted Shoemaker's
24 account when Shoemaker was fired from Northrop was a lie (and, presumably, defamed him);
25 second, Baker's statement that Shoemaker was not authorized to access the 547th IS computer
26 system was false and defamatory; third, Baker's statement that Shoemaker was no longer

associated with the 547th IS was false and defamatory; and fourth, Baker lied about Shoemaker's account (scott.shoemaker.ctr) having been newly created.

### i.     The Statements Were Either True or Irrelevant

As to the first statement, it is immaterial whether or not Baker lied in claiming that he had informed the 99th CS that Shoemaker's account should have been deleted. (Baker never actually claimed to have deleted the account personally, just that he verbally informed the 99th CS that Shoemaker had been fired and his account needed to be deleted.) This statement was not actually about Shoemaker but about Baker's own prior actions. Its only relevance is to whether or not Shoemaker's account would have had the technical ability to access the 547th IS system, which is irrelevant to whether he was actually authorized to access the system.

As to the second statement, Shoemaker claims that since his account was capable of accessing the 547th IS (presumably because Baker did not actually have his account deleted and his user account permissions were retained), he was authorized and permitted to access the 547th IS system (and presumably to do anything else he used to be allowed to do). Thus, Shoemaker claims that Baker's statement that he was not authorized to access the 547th IS system was defamatory. This argument is specious, at best, and actually quite ludicrous. For example, Shoemaker essentially argues that had Northrop forgotten to reclaim his keys (presuming he had any) to the 547th IS building, Shoemaker would have had every right to reenter the building at any time he wished (or at least once he was hired by ManTech) and access whatever didn't happen to be otherwise locked down. The record and common sense belie this argument. Multiple witnesses made clear in their deposition testimony that it is common knowledge in the military that once a person is no longer assigned to a unit, they no longer are entitled to access the former unit's computers, folders, or files. (*See, e.g.*, Dkt. #69 Ex. 6, Whitfield Dep. 57:13-58:17 ("If you don't work in an organization, that means—and he still has access because he—but he works someplace else, someone needs to raise the BS flag because that's not authorized. I don't have to be told by someone whether it is or isn't. It's not authorized."); *see also* Ex. 12, Maj. Boeh Dep. 16:5-17:3.)

7

No one disputes this concept other than Shoemaker himself, who simply claims that since he was not prevented from accessing the 547th IS system, he had permission to do so.  This claim is insufficient to avoid summary judgment.  Thus, it is immaterial whether or not Shoemaker's account was properly deleted since whether or not he was capable of accessing the 547th IS system is irrelevant to the question of whether he was permitted or authorized to do so.  After he was fired from Northrop, he was simply no longer permitted to access that system.  (*See id.*)

As to the third statement, Shoemaker claims that he was associated with the 547th IS contrary to Baker's statement because he attended a conference also attended by at least one Northrop contractor to the 547th IS and that this person, Ms. Brehio, burned him a CD with some of his old files and a computer application.  This 'association' does not make Shoemaker associated with the 547th IS any more than any employee's attendance at a business conference all of a sudden makes them associated with the various other companies that sent representatives who may have given out product samples, business cards, or other items.  Thus, Baker was truthful when he stated that Shoemaker was no longer associated with the 547th IS because Northrop had fired him and he no longer worked with or for the 547th IS in any manner.

As to the fourth statement, it is irrelevant whether the scott.shoemaker.ctr account was newly created and Shoemaker presents no evidence whatsoever that this statement was not true while Defendants presents ample evidence that it was.  Most importantly, it is irrelevant whether Shoemaker's account was newly created for purposes of whether he was authorized to access the 547th IS system (the context in which Baker made the statement and the context in which the statement has any affect).  Regardless of whether it was a new account or whether Baker mistakenly failed to have the account deleted (or any other person or system failed to delete the account), Shoemaker was not authorized to access the 547th IS system as explained above.  Further, Defendants provide evidence that the Air Force did not begin creating accounts with the '.ctr' suffix until 2007 and that existing accounts were not given the .ctr suffix until later.  (Dkt. #69, Ex. 5, Helmick Dep. 57:14-24; Ex. 15, White Dep. 20:24-21:17.)  Thus, since Shoemaker's

1   original account (created well before 2007) would have lacked the '.ctr' suffix, his
2   scott.shoemaker.ctr account had to have been recently created.  Finally, Defendants introduced
3   evidence that the system automatically deletes accounts that have been inactive for over 90 days,
4   which would have resulted in Shoemaker's original account having been automatically deleted.
5   (*Id.* Ex. 13, Brehio Dep. 40:9-41:2.)  Shoemaker does not dispute these facts with facts of his own,
6   but merely asserts that Baker must not have deleted his account because his account retained its
7   old abilities.[2]  This is in no way sufficient to meet Shoemaker's burden to avoid summary
8   judgment.

9   Thus, each of the statements Shoemaker complains of were either actually true,
10  irrelevant, or not defamatory.  Accordingly, the Court grants summary judgment on the defamation
11  claim on this ground alone.  However, the Court will also discuss the privilege issue.

### ii. Conditional Privilege

13  For a successful defamation claim, the statement must be unprivileged.  *Chowdry*,
14  851 P.2d at 462.  Privileged statements may be either absolutely privileged or conditionally
15  privileged.  *See Bank of Am. Nev. v. Bourdeau* , 982 P.2d 474, 475-76 (Nev. 1999).  A
16  conditionally privileged statement is protected from defamation liability as long as the privilege is
17  not abused by the speaker making the statement in bad faith or with malice.  *Id.*  "Whether a
18  particular communication is conditionally privileged by being published on a 'privileged occasion'
19  is a question of law for the court; the burden then shifts to the plaintiff to prove to the jury's
20  satisfaction that the defendant abused the privilege by publishing the communication with malice
21  in fact.  The question goes to the jury only if there is sufficient evidence for the jury reasonably to
22  infer that the publication was made with malice in fact." *Id.* at 476 (quoting *Circus Circus Hotels,*

---

[2] While still irrelevant, the Court can conceive of a technical glitch or bug (or possibly feature depending on viewpoint) where an automatically deleted account is given its old technical permissions upon reactivation and how Shoemaker's account may have just been reactivated rather than completely recreated.  Whether or not this is the case or whether Shoemaker's account never was deleted is still irrelevant to whether he was authorized to access a computer and files in a different section of the Air Force from where he worked.

9

*Inc. v. Witherspoon*, 657 P.2d 101, 105 (Nev. 1983)). "A former employer has a qualified or conditional privilege to make otherwise defamatory communications about the character or conduct of former employees to present or prospective employers, as they have a common interest in the subject matter of the statements." *Circus Circus*, 657 P.2d at 105 n.3 (citing *Walsh v. Consolidated Freightways, Inc.*, 563 P.2d 1205 (Or. 1977)). Further, a conditional privilege exists if a "'defamatory statement is made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or a duty, if it is made to a person with a corresponding interest or duty.'" *Id.* at 105 (citations omitted).

The Court finds that Northrop and Baker had a conditional privilege to discuss possible computer security violations not only because Northrop formerly employed Shoemaker but because they had an interest in the subject and a right or duty to speak on the subject. *Bordeau*, 982 P.2d at 476. Had Baker not reported a possibly wrongful intrusion on the network he would have violated his duties and responsibilities to the Air Force. Thus, the statements were conditionally privileged. At this point, it would normally be the province of the jury to determine whether Baker made the statements with malice or bad faith because of Shoemaker's allegations that Baker was merely trying to cover up his own error in not deleting Shoemaker's old account. However, in contesting the element of privilege, Shoemaker only claimed that the Baker's statements were not privileged because they were not made to law enforcement. (Dkt. #76, Opp. 27:7-11.) Whether or not these statements were made to law enforcement is irrelevant to whether a conditional privilege existed. Thus, Shoemaker failed to actually contest the existence of a privilege and the Court alternatively grants summary judgement on this ground.

**C.   Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage**

The two tortious interference claims are substantially similar and the Court will address them concurrently. To prevail on his tortious interference claims, Shoemaker must show: (1) a valid contract or prospective contractual relationship exists or existed between him and a

third party; (2) Defendants knew of the contract or prospective contractual relationship; (3) Defendants committed intentionally wrongful acts intended or designed to disrupt or prevent the contractual relationship; (4) the Defendants had no privilege or justification; and (5) Shoemaker sustained actual damages as a result. *See Consolidated Generator-Nevada, Inc. v. Cummins Engine Co. Inc.*, 971 P.2d 1251, 1255 (Nev. 1998); *Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 862 P.2d 1207, 1210 (Nev. 1993); *see also Leavitt v. Leisure Sports, Inc.*, 734 P.2d 1221, 1226 (Nev. 1987).

Shoemaker has failed to show that Defendants committed any intentionally wrongful acts and, therefore, the Court grants summary judgment on these claims. As stated above in reference to Shoemaker's defamation claim, it is irrelevant whether Shoemaker's account had the technical ability to access the 547th IS system or whether Baker failed to properly have the account deleted in some way. Shoemaker simply was not authorized to access the 547th IS computer as a ManTech employee working with JUAS COE, a separate entity within the Air Force. Thus, Baker's reporting the intrusion was not a wrongful act and the tortious interference claims fail as a matter of law.

### D. Civil Conspiracy

To prove a claim of civil conspiracy, Shoemaker must show an underlying tort or other legal wrong and an agreement to commit that tort or wrong. *See GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001); *see also Eikelberger v. Tolotti*, 611 P.2d 1086, 1088 n.1 ("A civil conspiracy is a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means."). As shown above, Shoemaker has not shown an underlying tort or other legal wrong. Shoemaker bases his civil conspiracy claim on his defamation claim, which fails. However, Shoemaker's other tort claims also fail. Thus, there is no underlying tort or wrong on which Shoemaker's civil conspiracy claim could possibly lie. Accordingly, the Court grants summary judgment against this claim as well.

In sum, Shoemaker bases his claims on his technical ability to access the 547th IS computer system (presumably because Baker failed to have his account deleted) and Baker telling other people that Shoemaker was not authorized to access these systems and the events resulting from Baker's statements. The Court finds that whether or not Shoemaker's account was deleted is irrelevant because it does not matter whether his account could access the 547th IS system because it had the technical permissions or ability to do so. Regardless of ability he was simply not authorized to access the 547th IS system because he was not employed by the 547th IS or Northrop at the time of the access. Based on this and other conclusions of law, each of Shoemaker's claims against Baker and Northrop necessarily fail and the Court grants summary judgment on Shoemaker's claims.

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (#69) is GRANTED. The Clerk of the Court is directed to enter judgment in favor of Defendants and close this case.

Dated: December 1, 2011.

_____
**ROGER L. HUNT**
**United States District Judge**